## FIRST NATIONAL BANK OF SPARTA *v.* HANCOCK WAREHOUSE COMPANY.

1. A cotton-buyer gave to a bank written notice directed to a warehouse company, as follows: "This is to notify you that all cotton bought by me and paid for by the First National Bank belongs to them, and can not be disposed of by me without their consent, the cotton being subject to their order." It appeared that this notice was dated September 27, 1911, and was exhibited by an officer of the bank to an officer of the warehouse on the day following. The testimony is in conflict as to whether the warehouse accepted the notice as binding on it. Cotton was bought and put in charge of the warehouse both before and after the date of the notice. *Held,* that the language of the notice is ambiguous, and parol evidence is admissible to explain whether it was intended only to apply to cotton which the buyer had already purchased at the time of signing the notice, or whether it also included purchases made subsequently thereto.

2. The court did not err in admitting the testimony of certain witnesses as set out in divisions 2, 3, and 4 of the opinion.

3. The court erred in directing a verdict for the defendant.

JULY 16, 1914.

Complaint. Before Judge James B. Park. Hancock superior court. August 9, 1913.

The First National Bank of Sparta brought suit against the Hancock Warehouse Company, and the petition shows substantially the following: During the cotton season of 1911 J. A. Thomas purchased from the Hancock Warehouse Company 156 bales of cotton at various times, giving in payment therefor his checks upon the First National Bank of Sparta, drawn in favor of the Hancock Warehouse Company. On September 27, 1911, Thomas sent the defendant instructions in writing as follows: "Sept. 27, 1911. The Hancock Warehouse Company, City. . . This is to notify you that all cotton bought by me and paid for by the First National Bank belongs to them, and can not be disposed of by me without their consent, the cotton being subject to their order. Very respectfully, [signed] Joe A. Thomas." This order was delivered by Thomas to H. L. Middlebrooks, the cashier of the plaintiff bank, and by him, on September 28, exhibited to James W. Alfriend, president of the Hancock Warehouse Company, with instructions to hold all cotton paid for by check of Joe A. Thomas on the First National Bank of Sparta subject to the order of the bank, which instructions Alfriend, as president of the warehouse company, agreed to recognize and comply with, and in compliance with the

instructions declined to ship one hundred and forty-two bales of cotton then in defendant's warehouse and paid for by the plaintiff bank on the order of Joe A. Thomas, until such instructions were received from the plaintiff bank.  On September 29, 1911, Joe A. Thomas gave to the Hancock Warehouse Company his check on the First National Bank of Sparta for the sum of $603.33, payable to the Hancock Warehouse Company, in payment for eleven bales of cotton.  On September 30, 1911, Joe A. Thomas gave to the Hancock Warehouse Company his check on the First National Bank of Sparta for $140.14, payable to the order of the Hancock Warehouse Company, in payment for three bales of cotton.  The fourteen bales of cotton so purchased were paid for in the due course of trade in the same manner as the 142 bales before referred to, which had been held by the warehouse company subject to the order of the plaintiff bank.  The two checks referred to were indorsed by the Hancock Warehouse Company and paid by the First National Bank of Sparta.  On October 7, 1911, the plaintiff bank, through its cashier Middlebrooks, ordered the Hancock Warehouse Company to ship the last fourteen bales of cotton to Nixon & Wright, Augusta, Georgia, the instructions being given to James W. Alfriend, president of the warehouse company, his attention having been called to the previous order of Thomas to the warehouse company above referred to, and to the fact of the cotton being paid for by the bank, which instructions Alfriend, for the warehouse company, declined to comply with and refused to deliver the cotton to the plaintiff bank, or its order.  On October 11, 1911, the plaintiff bank, in writing, requested the defendant warehouse company to furnish it with the numbers, weights, and marks of the 14 bales of cotton, in order that it might be in possession of the description of the cotton paid for by it on the checks of Joe A. Thomas.  On October 12, 1911, the warehouse company declined in writing to furnish the information requested by the plaintiff, stating that the 14 bales of cotton were at the time stored in the warehouse and that the defendant company had issued receipts therefor on the order of Joe A. Thomas, without the consent or knowledge of the plaintiff bank, and contrary to the instructions previously given to the warehouse company and which the latter had agreed to comply with.  Joe A. Thomas is insolvent, and a judgment against him for $743.47, the amount of the checks, is uncollectible.  The checks

would not have been paid by the bank except for the instructions given by Thomas to the defendant company, which the latter agreed to observe, and on the faith of which the checks were paid. By its refusal to comply with the foregoing instructions, upon the faith of which it collected from the plaintiff bank the checks, and by declining to deliver the 14 bales of cotton to the plaintiff bank, the defendant company has damaged the plaintiff in the sum of $743.47, besides interest, for which it seeks judgment.

The defendant denied the material allegations of the petition, and answering specially, among other things, averred: that the instructions in the letter of Thomas to the warehouse company were exhibited to its president, J. W. Alfriend, on September 28, 1911; but it denied that it agreed to recognize and comply therewith. Its president stated to the cashier of the plaintiff that the defendant would decline to accept the terms and conditions of the letter of Thomas by writing an acceptance on the bottom of the letter, but that Alfriend would reply to the letter of Thomas, accepting instructions as to shipping cotton, and would also notify the plaintiff bank in writing that defendant had such instructions and would hold cotton subject to their order. Middlebrooks, cashier, then withdrew the letter of Thomas, stating to Alfriend that he would make a copy of the letter and forward the original to the defendant during the afternoon of September 28, 1911. Alfriend stated to Middlebrooks that upon receipt of the letter they would either decline or agree to ship cotton under the instructions above referred to. Without having received the letter referred to, after its being withdrawn from the defendant as alleged, the defendant was notified by Joe A. Thomas to ship 142 bales of cotton which he had purchased and held in the warehouse of the defendant, Thomas stating at the time that he would also get the plaintiff bank to notify the defendant to ship this lot of cotton. The plaintiff did notify the defendant to ship, as Thomas had already done, the 142 bales, and they were shipped under these instructions on September 29, 1911. The defendant admits that the 14 bales of cotton were purchased from it by Thomas and were paid for by checks on the plaintiff bank, but denies that there were instructions from the plaintiff bank as to these 14 bales at the time, or that these 14 bales were held subject to any order from the plaintiff bank. The 14 bales of cotton were purchased by Thomas in due course of trade, with no agreements or contracts

between the defendant and the plaintiff in regard thereto. The cotton, after having been paid for by Thomas, was held by the defendant subject to his order as purchaser, he stating to the defendant that the instructions which he had given the plaintiff on September 27, 1911, referred only to cotton which he had on hand in defendant's warehouse at the time the letter of instructions was given, and which, under the verbal instructions of Thomas and the plaintiff had been shipped by the defendant on September 29, 1911. On October 6, 1911, Thomas called on the defendant for warehouse receipts for the 14 bales of cotton which he had purchased on September 29, 1911, and the defendant issued warehouse receipts to the order of Thomas for the cotton before any orders and instructions were received from the plaintiff, which the defendant did not know in the transaction, except to accept payment for the cotton in due course of trade, by checks drawn by Thomas on the plaintiff bank. At such time the defendant had no previous order of Thomas as to any shipment of cotton; all the cotton which had been shipped was shipped on verbal orders of Thomas, and the 142 bales under verbal orders of Thomas and the plaintiff bank. The written order of September 27, 1911, had been withdrawn by the plaintiff, and was not in the possession of the defendant. After this, defendant notified plaintiff that it had issued warehouse receipts for the 14 bales of cotton and could not ship the cotton under plaintiff's orders and instructions. The letter, which the plaintiff bank had held since September 27, 1911, was by the plaintiff mailed by registered letter on the afternoon of October 7, 1911, and received by the defendant on October 8, 1911. Defendant denies that it had any agreement with the plaintiff in reference to the 14 bales of cotton for which it issued its receipts to Thomas.

The witnesses for the plaintiff testified substantially to the allegations set out in the petition. Middlebrooks, plaintiff's cashier, testified that the letter was to cover all cotton that might be purchased; and the defendant's witnesses testified to the averments of the answer. After the evidence was all in, the court instructed the jury that the letter of instructions of September 27, 1911, was not ambiguous, and would only include cotton that had been purchased by Thomas and paid for by the plaintiff bank up to September 27, 1911. He then directed a verdict for the defendant, which was accordingly rendered. A new trial was refused, and the plaintiff excepted.

*Burwell & Fleming,* for plaintiff.

*R. L. Merritt,* for defendant.

HILL, J. (After stating the foregoing facts.)

1. The court below held that the following letter, written by the purchaser of certain cotton from the defendant warehouse company, was not ambiguous, and that it only referred to cotton which had been purchased by Thomas and paid for by the First National Bank of Sparta up to September 27, 1911, the date of the letter. A verdict was accordingly directed for the defendant, and exception was taken to the judgment overruling the plaintiff's motion for a new trial. The letter was as follows: "Sept. 27, 1911. The Hancock Warehouse Company, City. Gentlemen: This is to notify you that all cotton bought by me and paid for by the First National Bank belongs to them, and can not be disposed of by me without their consent, the cotton being subject to their order. Very respectfully, [signed] Joe A. Thomas." Is the language contained in the above-quoted letter unambiguous, as held by the trial judge? Ambiguity is an uncertainty of meaning in the terms of a written instrument. 1 Words & Phrases, 367. Under our Civil Code, § 4268, parol evidence is admissible to explain both latent and patent ambiguities. In *Belle Green Mining Co.* v. *Tuggle,* 65 *Ga.* 652, 657, Chief Justice Jackson thus states the rule: "Parol testimony may explain written terms when doubtful, and if those terms do not show a clear meaning, the understanding of the parties may be shown outside to ascertain the meaning; but where the contract is not cloudy, but all light, it were folly to make it shine by lesser lights. Where the sun is shining, gas is useless." In *Armistead* v. *McGuire,* 46 *Ga.* 232, it was held: "Where the language of an instrument in writing is ambiguous and may be fairly understood in more ways than one, it should be taken in the sense put upon it by the parties at the time of its execution, and the court will hear evidence as to the facts and surroundings, and decree according to the truth of the matter." It is insisted that the language of the letter of instructions is susceptible of but one construction, namely, that it referred to cotton which had already been "bought" and had been "paid" for, and at that time belonged to the First National Bank of Sparta. If this view is correct, then the court was undoubtedly right in the construction placed by him upon the letter of Sept. 27th, and in directing a verdict for the defendant. But from a

careful reading of the letter we think it is also susceptible of the construction that it referred not only to all cotton previously bought by Thomas and which was paid for by the bank, but to all cotton which was to be bought by Thomas in the future and thus paid for. The testimony of the officers of the bank tended to show that Thomas was insolvent, and that this letter was the sole basis of credit upon which the checks given by Thomas to the warehouse company were paid by the bank. And the testimony of Thomas himself tended to show that, of the thousands of bales of cotton bought by him and paid for by the bank, this was the only transaction in which he had had the cotton receipts issued in his own name. The president of the warehouse company had been notified of the letter and its contents. The evidence for the plaintiff tended to show that in all the transactions between Thomas and the bank the title to the cotton was to be in the bank. Under the uncertainty of the language as contained in the letter, what was the real intent of the parties as expressed in the letter itself? If the meaning is uncertain, as we think it is, then parol evidence should be allowed to go to the jury that they may find what the true meaning of the parties was. We do not think it can be said, as matter of law, under the facts of this case, that the letter is so certain and definite that parol evidence is not admissible to explain the true meaning of the parties. See 9 Cyc. 577, 579, 585, 587; *Armistead* v. *McGuire, 46 Ga.* 232. In Agawam Bank *v.* Strever, 18 N. Y. 502, 513, where a note was delivered to a bank with a written memorandum thereon that it was left as collateral security for "all liability incurred by D. & H.," it was held, "that evidence was admissible for the purpose of arriving at the intent of the parties in the hypothecation, that D. & H. were, at the time, under no liability to the bank. The words 'all liability' in the contract of hypothecation import a continuing guaranty, and not a security for a single sum, or exhausted when the loans equal the amount of the note." See also Olson *v.* Cook, 57 Minn. 552 (59 N. W. 635); 1 Words & Phrases, 319. The letter being ambiguous, the case under the testimony should have been submitted to the jury.

2. Error is assigned because the court allowed H. L. Middlebrooks, the cashier of the plaintiff and a witness on its behalf, in response to a question of defendant's counsel on cross-examination, to testify: "Mr. Thomas executed to us a note and mortgage for

$500, to secure anything that he might lose in the cotton business thereafter. This is the note and his signature (indicating note as appears on page 9 of the brief of evidence). That was on the day he signed this letter, but I don't recall whether they were signed at the same time. The $500 note was a margin on which he was to purchase cotton that season. We still hold Mr. Thomas's note and have made no effort to collect it; it was simply given as a margin." This ruling of the court was not erroneous for the reason that, Thomas not being a party, the private arrangements for financing his personal account were not relevant to the issue in the case, it not being contended that the bank had not lost the amount paid for the 14 bales of cotton. This evidence was admissible as throwing some light on the meaning of the letter of September 27, 1911.

3. Complaint is made because the court allowed J. A. Thomas, a witness for the defendant, to testify, over the objection of plaintiff's counsel, as follows: "I exhibited this letter of credit [indicating letter of R. L. Wall to J. A. Thomas, dated September 11th, 1911] to Mr. H. L. Middlebrooks, and he said, all right, to go ahead and buy cotton. On this I bought 200 or 300 bales of cotton. I bought cotton by giving my check for it, shipping to R. L. Wall, and he gave the draft, and I would pay the warehouse with my check on the First National Bank. I did not buy a bale of this cotton for J. A. Thomas individually, I bought it on a letter of credit mailed to me by Mr. Wall." This evidence was admissible for the same reason as that set out in the preceding division of this opinion.

4. Error is assigned because the court permitted J. A. Thomas, a witness for the defendant, to testify: "Mr. Middlebrooks suggested that I buy 40 or 50 bales of cotton to reduce the average price. He said, 'Give me a margin and buy cotton for yourself.' I gave him a $500 mortgage as a margin to buy cotton in the future." This ruling was not erroneous for the reason assigned, that Thomas was not a party to the case and his private transaction could not affect the issue. It was admissible for the same reasons given in the two preceding divisions of this opinion.

5. The court erred in directing a verdict for the defendant. The evidence should have been submitted to the jury. It was a question for the jury to determine from all the evidence what the parties meant by the language as contained in the letter of Sep-

tember 27th. Was the title to all the cotton purchased by Thomas and paid for by the bank after that date to be in the bank, subject to its order; or was only the cotton so purchased and paid for prior to that date to belong to the bank and to be subject to its order? Did the warehouse company agree to hold all the cotton purchased by Thomas, and paid for by the bank subsequently to September 27th, subject to the order of the bank? These are some of the issues of fact which should be submitted to the jury under the evidence. We think the court erred in holding the letter of September 27 unambiguous, and in directing a verdict for the defendant.          *Judgment reversed. All the Justices concur.*