## 20235. FIREMAN'S FUND INSURANCE COMPANY *v.* DAVIS *et al.*

DECIDED SEPTEMBER 8, 1930. REHEARING DENIED SEPTEMBER 29, 1930.

50

*Smith, Hammond, Smith & Bloodworth, W. L. Bryan, Bond & McClure,* for plaintiff.

*George L. Goode,* for defendant.

BELL, J. (After stating the foregoing facts.)

1. The defendants agreed "to return to the company all unearned commissions on premiums on cancelled policies," and that the agency could "be terminated at any time at the pleasure" of the company. There was no ambiguity in the last statement and the plaintiff can not be denied a recovery upon any ground relating to its right to terminate the agency and withdraw from "farm business" in Stephens County; but the question of what were "unearned commissions on premiums on cancelled policies" is an entirely different matter, and is one that is involved in ambiguity under the terms of the agency contract. To speak of unearned commissions is to imply that there may also be earned commissions, and the necessity of an explanation as to the meaning of the former expression is instantly suggested by a reading of the contract. Even if the phrase "unearned premium" might be the subject of judicial definition, the same would not necessarily be true of the expression "unearned commissions." Thus, if the contract had simply called for the return of commissions on unearned premiums, or of commissions on cancelled policies, the case would be stronger for the plaintiff, and might perhaps be clear of ambiguity; but since the contract is entirely silent as to the rate or conditions of the compensation to be allowed to the agents, and contains nothing to show what are *earned commissions,* there was a patent incompleteness or uncertainty as to what were unearned commissions.

Parol evidence is admissible to explain all ambiguities both latent and patent; and where it is manifest that the writing was not intended to speak the whole agreement, parol evidence is then "allowed to show an agreement referable to the incompleteness when not inharmonious with the writing. The question in such cases is whether there is a vacuum to be filled." *Pryor* v. *Ludden & Bates,* 134 *Ga.* 288, 290 (67 S. E. 654, 28 L. R. A. (N. S.) 267); *Savannah Lighterage Co.* v. *Savannah,* 112 *Ga.* 189 (37 S. E. 424); Civil Code (1910), §§ 4268 (1), 5789.

The plaintiff contracted with the defendants for services to be performed by them in the capacity of agents, and yet, in the very elaborate writings, including a solicitor's agreement of many promises and stipulations, followed by a formal commission or appointment, there is no statement as to the compensation or consideration to be allowed for such services, except in the few and meager expressions which we have quoted above in this opinion or in the statement which precedes it. How were the defendants to be paid? What was the percentage of the premium to be allowed to them, if they were to be paid on this basis? If the percentage was high, the defendants might have agreed to conditions and burdens which would be entirely unsatisfactory if the rate were lower. Both the company and the agents might reasonably have agreed, either upon a rate of compensation that would be low if unconditional, or high if subject to some condition favorable to the company, as that in case the policy was cancelled and a portion of the premium refunded to the insured the agents would return to the company a proportional part of the commissions received. The answer alleges that the policies were expected to be written for a period of five years each, and that the premiums were payable one fifth cash, with the remainder to be paid in four equal annual installments. The courts can not say as a matter of law whether an unconditional commission of 20 per cent. would be reasonable or unreasonable, and this court can not take judicial cognizance of terms and conditions upon which insurance companies employ their local agents. In view of the very inadequate references to the subject of compensation in the contract before us, it certainly could not be said by this court that the parol agreement pleaded by the defendants was inconsistent with the writing. Cf. *Napier* v. *Pool,* 39 *Ga. App.* 187 (2) (146 S. E. 783); *Renfroe* v. *Alden,* 164 *Ga.* 77 (137 S. E. 831).

What was the consideration to be paid for the defendants' services? "The consideration of a contract may be inquired into and established by parol, where the object of the inquiry is not to contradict or vary a specific consideration actually agreed on and expressed in the writing." *Bing* v. *Bank of Kingston*, 5 *Ga. App.* 578 (63 S. E. 652); *Taylor* v. *Thomas*, 61 *Ga.* 472 (2); *Atkinson* v. *Lanier*, 69 *Ga.* 460 (2). In order to determine what were unearned commissions in this case, it was necessary to resort to the terms and conditions of the defendants' employment, and these could not be ascertained by an examination of the written agreement alone. Upon the face of the writing there was both incompleteness and uncertainty, and it was permissible to show the parol agreement which the parties actually entered into and which was necessary to establish a complete, express contract between them. See, in this connection, *Armistead* v. *McGuire*, 46 *Ga.* 232; *Maynard* v. *Render*, 95 *Ga.* 652 (23 S. E. 194); *Morrison* v. *Dickey*, 122 *Ga.* 417 (50 S. E. 178); *Novelty Hat Co.* v. *Wiseberg*, 126 *Ga.* 800 (55 S. E. 923); *Georgia Iron Co.* v. *Ocean Accident &c. Cor.*, 133 *Ga.* 326 (65 S. E. 775); *First National Bank* v. *Hancock Warehouse Co.*, 142 *Ga.* 99, 103 (82 S. E. 481); *Richter* v. *Kilpatrick*, 143 *Ga.* 470 (85 S. E. 319); *Reeves* v. *Daniel*, 143 *Ga.* 569 (2) (85 S. E. 756); *Kilpatrick* v. *Richter*, 146 *Ga.* 277 (91 S. E. 51); *Davis* v. *Jones*, 153 *Ga.* 639 (112 S. E. 891); *Kiker* v. *Broadwell*, 30 *Ga. App.* 460 (2) (118 S. E. 759); *Horne* v. *Evans*, 31 *Ga. App.* 370 (2) (120 S. E. 787); Civil Code (1910), § 4267. The parol agreement as stated in the plea was that commissions of 20 per cent. would be considered earned and not subject to be lost or returned as between the plaintiff and the defendants, except where a policy was cancelled for nonpayment of premiums. Such an agreement could have been entered into without in any way infringing the right of the plaintiff to terminate the agency at any time. This is true for the reason that the plaintiff could have cancelled the agency without cancelling the policies written by the defendants. If in fact the parties did so agree as to when the commissions would be unconditionally earned and fixed, the clause as contained in the policies *thereafter written,* giving the plaintiff insurer the right to cancel such policies upon a stated notice to the holders and a refund of the unearned premiums, would not necessarily supersede the agreement *between the plaintiff and the defendants* as to the com-

pensation to be allowed for the defendants' services. Such cancellation clause was only a provision of the contracts between the company and the policyholders, and did not become a part of the previous contract between the plaintiff and the defendants merely because the defendants countersigned the policies as agents for the insurer. See, in this connection, *Camp* v. *Ætna Ins. Co.*, 170 *Ga.* 46 (152 S. E. 41).

The answer shows that George B. Cooper was a special agent, but it does not disclose the extent of his authority. So far as appears, he may have been a special agent to employ local agents; and if so, he acted within the scope of his employment in making the agreement set forth in the defendants' plea. There is nothing in the petition or in the answer to negative this fact; and the answer, even though by implication, sufficiently alleged such authority, as against a general demurrer. *Ryle* v. *Central of Georgia Ry. Co.*, 30 *Ga. App.* 737 (4) (119 S. E. 342) ; *Yellow Cab Co.* v. *General Lumber Co.*, 35 *Ga. App.* 620 (134 S. E. 190). The answer with the amendments set forth a valid defense, and it was therefore proper to overrule the general demurrers. We defer for the present any discussion of the special demurrers. Some reference should be made to the cases cited from other jurisdictions in the very able and painstaking brief of counsel for the plaintiff in error.

In Hill *v.* Ætna Ins. Co., 180 Ark. 401 (21 S. W. (2d) 180), an agent agreed to return "any unearned commission paid him on that part of the premium returned to the assured on such cancelled policy or the application for same." But in that case the contention of the agent was merely that he was not liable for a refund of commissions until the unearned portion of the premium had been returned to the insured, it being admitted that if the company had returned the premiums to the insured the agent would have to return any unearned commissions. In Stone *v.* Hartford Fire Ins. Co., 231 Ky. 264 (21 S. W. (2d) 281), the writings were substantially identical with those involved in the present case; but the chief contention of the agent was that the solicitor's agreement, properly interpreted, did not provide for the general cancellation of policies issued by the insurer on applications which the agent had procured. The court said that "the agreement is not ambiguous, and requires no extraneous evidence to explain its terms," and

went on to discuss the rights and liabilities of the parties; but that part of the decision cited here as authority was evidently directed to the evidence offered by the agent "to show that it was not contemplated by the parties that all of the policies should be cancelled and the agency thus terminated. This was an effort to contradict the terms of a written contract by parol evidence, which is not permissible." The defendants in the case now under consideration went further than merely to deny the right of the company to terminate the agency or to cancel the policies in bulk, and showed a parol agreement as to the percentage of the commission to be paid and as to when the commissions would be earned. In National Union Fire Ins. Co. v. Nason, 21 Cal. App. 297 (131 Pac. 755), it was stated that the position taken by the agent was, that, since the policies were cancelled after the termination of his agency, he was not responsible for any returned premiums; and the question for determination was whether the agent was liable to refund the commissions, irrespective of the time of the cancellation. In Milwaukee Mechanics Ins. Co. v. Warren, 150 Cal. 346 (89 Pac. 93), the written agency contract expressly provided for a commission of 35 per cent. of gross premiums, after deducting all returned premiums, rebates and reinsurance. It was accordingly held that the agents were chargeable with 35 per cent. of returned premiums on policies written during the agency and paid by the company after the termination thereof. The contract was definite and complete, and the defendants raised no such questions as those presented here. In American Steam-Boiler Ins. Co. v. Anderson, 6 N. Y. Supp. 507, the agents themselves procured a policy to be cancelled, and then solicited the insured to take a policy in another company, which he did. The old company then returned to him the unearned portion of the premium paid, and called upon the agents for a refund of the proportional part of the commissions which they had received. The contract in that case specified a commission of 30 per cent. upon all premiums, to be deducted from the monthly statements to be rendered by the agents and settled for each month. Apparently, the sole contention was that under the contract the agents were not liable for a refund of commissions unless the policy was cancelled before the agents had made the monthly statement and settlement regarding it. There was an effort to prove a custom in support of this construction, but

the evidence of such custom was excluded, and this ruling was sustained on appeal. The decision in that case was by the superior court of New York City, and was reviewed by the Court of Appeals in 130 N. Y. 134; and while the judgment was affirmed, the decision of the appellate court took no account of the ruling of the lower court upon the admissibility of the evidence as to custom, but placed its decision rather upon the ground that the defendants could not deny their liability for a refund of commission, when they had themselves procured a cancellation of the policy for the purpose of rewriting it with another company and of obtaining a second commission.

In National Union Fire Ins. Co. v. Nevils, 217 Mo. App. 630 (274 S. W. 503), the decision contains a discussion upon the subject of unearned commissions on cancelled policies, and much of the language would seem, on a casual reading, to support the position of the present plaintiff in error. In that connection, however, the court was considering the question whether the provisions of the bond sued on were such as to include a liability for unearned commissions, the bond being for "all amounts due or that may become due to it from time to time for moneys collected or received by him for premiums on policies of insurance and renewals thereof, or for any ground whatever." We do not think that the reasoning employed by the court to determine whether such language of the bond was sufficient to cover a liability for unearned commissions on cancelled policies should be taken even as persuasive authority upon the entirely different question as to whether a particular contract manifests such an ambiguity or incompleteness as to permit the pleading and proof of a parol agreement as to when commissions would be earned. Other cases cited by counsel are not so nearly in point as those above mentioned, and it is unnecessary to make reference to them.

2. Did the evidence support the allegations of the defendants' plea? The bond, the provisions of which were quoted in the statement, should be considered as part and parcel of the agency contract, since it was simultaneously executed and was one of the conditions of the defendants' appointment. *Gilford* v. *Green*, 33 *Ga. App.* 1 (125 S. E. 80). However, by a reference to its terms it is seen that it sheds no greater light upon the meaning of the expression "unearned commissions" than is gained from the writ-

ings attached to the petition. It follows that, even though all the writings were taken together, the ambiguity as to unearned commissions still remained, and the evidence in support of the plea was not more subject to objection than were the allegations of the answer. In this connection, it is interesting to notice the testimony of R. S. Rust Jr., the superintendent of the plaintiff's farm department, who was sworn as a witness in its behalf. He testified in part as follows: "It is entirely a matter that my company would have a perfect right to make any contract it saw fit with reference to these commissions—or their earning or not being earned. They would have a right to name any grade of commissions. My company had a perfect legal right to give him 50 per cent. We had a right as an insurance company doing business, desiring to place business on our books, and there was no reason why we should not have made any kind of contract as to commissions. With reference to our farm business, there was no reason, in competition with other companies, why our company should not have said to agents, 'Other companies will make you hold this commission for five years, but we are perfectly willing for you to take the first year's commission absolutely.' They are a corporation and can do what they want to. If we had waived return commissions, it would not have any fixed meaning. The meaning of 'unearned commissions' would not have meant anything—in other words, the term 'unearned commission' would mean that portion of the commission or premium that when the policy is cancelled the company withholds the right to claim that part of the premium—that part of the commission that the premium has not earned. And the company is at just as much liberty to contract with reference to that as to the original commission. They could do it. It wouldn't be good policy to do it. These five-year contracts are designated at 20 per cent."

It is further contended that George B. Cooper, with whom the defendants negotiated for the agency, was merely a special agent, without authority to make any agreement as to the terms of the employment, and that the defendants, in dealing with him as a "special agent," were bound to take notice of the extent of his authority. Inman v. Crawford, 116 Ga. 63 (2) (42 S. E. 473); Southern Ry. Co. v. Grant, 136 Ga. 303 (2) (71 S. E. 422, Ann. Cas. 1912C, 472); Terry v. International Cotton Co., 138 Ga. 656 (3) (75 S. E. 1044). Several witnesses sworn for the plaintiff,

including Cooper himself, testified that he had no authority to make such an agreement as that relied on by the defendants, and on the plaintiff's stationery and in the contracts, wherever his name appeared, it was followed by the words "Special Agent," or an abbreviation for this title; but this evidence was not conclusive of his authority or apparent authority in the premises. Mr. Rust, the superintendent of the plaintiff, a part of whose evidence has been quoted above, testified further as follows: "I remember when he called [referring to a long-distance telephone call by Mr. John H. Davis, one of the defendants]. Mr. Davis wanted to make a local-agent agreement, and we told him we would send a man to contract with him. I will not say positively. I am under the impression I am the man who talked to him over the phone. I said that I would send a man to contract with him. We sent a man there to see him—I would not say contract—to negotiate with him. And what the negotiations were, I know only to the extent that Mr. Cooper came back with this particular paper and the bond. What transpired between Mr. Davis and Mr. Cooper I do not know. I know nothing about the negotiations." At another point the same witness testified: "Mr. Cooper had full authority to negotiate with him in regard to the contract. I do not know what negotiations led up to the signing of this instrument by Mr. Davis."

The extent of an agent's authority is not determined by the title affixed to his name. One may be called a special agent, and yet be given the broadest powers. If a person imposes upon another the duties and responsibilities involving the management and control of a matter of business, the agent will be presumed to have authority to represent his employer in any matter within the scope of his apparent authority. *Pickens Co.* v. *Thomas,* 152 *Ga.* 648 (111 S. E. 27, 21 A. L. R. 1438) ; *Raleigh & Gaston R. Co.* v. *Pullman Co.,* 122 *Ga.* 700 (4) (50 S. E. 1008) ; *Hargrove* v. *Armour Fertilizer Works,* 31 *Ga. App.* 465 (2) (120 S. E. 800). In *Langston* v. *Postal Telegraph-Cable Co.,* 6 *Ga. App.* 833, 834 (65 S. E. 1094), it was said that "the mere designation by which an agent is known is not conclusive of the extent of his authority, . . and the test is what duties are performed by the agent and what authority he is held out to the public to have." While it is provided in the Civil Code, § 3595, that "in special agencies for a particular purpose, persons dealing with the agent should ex-

amine his authority," still, "so long as a special agent does not go beyond the necessary and usual means for executing his agency, his powers with reference to the *particular undertaking* are in the nature of those of a general agent to the extent that private instructions or limitations not known to the person dealing with him can not affect them." *Callaway* v. *Barmore,* 32 *Ga. App.* 665, 677 (124 S. E. 382). "A principal is bound to the extent of the apparent authority he has conferred upon the agent, and not by the actual or express authority, where that differs from the apparent authority." *Turner* v. *Clark,* 143 *Ga.* 44 (3), 46 (84 S. E. 116). "Where one holds another out as his special agent, the principal is bound by the agent's apparent authority to do the particular thing thus authorized, . . and to employ all usual and necessary means that may be reasonably required, in the due, proper, and ordinary performance of the particular purpose of the appointment." *Wise* v. *Mohawk Rubber Co.,* 23 *Ga. App.* 255 (98 S. E. 100); *New York Life Ins. Co.* v. *Smith,* 39 *Ga. App.* 160 (147 S. E. 126); *Brady* v. *Sappington,* 40 *Ga. App.* 781 (151 S. E. 525). In *Friese* v. *Simpson,* 15 *Ga. App.* 786 (4 *b*) (84 S. E. 219), it was held: "When notice of a fact is communicated to a general agent or to a special agent in absolute charge of a particular business, knowledge of all the facts suggested by the notice is imputable to the principal." Thus, although the powers of Cooper may have been ever so limited, and he may have introduced himself, or may have been introduced, as a "special agent," the evidence shows that when Davis, one of the defendants, called the plaintiff insurance company over the long-distance telephone to ask for the agency, he received the reply that a man would be sent "to contract with him." In the circumstances he was authorized to act upon the assumption that such agreements as were made with him who was sent would constitute an agreement by the company, and would be binding in so far as it did not contravene the terms of the writings which were carried away for consideration and acceptance by the company through its superintendent or other officers.

It is further insisted that the evidence shows without dispute that the words "unearned commissions" are technical words connected with a particular trade, and that the expression means that part of the commission which "bears the same proportion or ratio to the

total commission as the unearned premium would bear to the total premium." Cf. *Asa G. Candler Inc.* v. *Georgia Theater Co.*, 148 *Ga.* 188 (4) (96 S. E. 266, L. R. A. 1918F, 389); *Featherston* v. *Rounsaville, 73 Ga.* 617. This being the evidence, it is said that the finding and judgment in the defendant's favor were contrary to the evidence, and should be set aside for this reason, irrespective of other questions. We can not concur in this view. Regardless of the true technical meaning of the expression referred to, the fact remains that it was uncertain and ambiguous upon its face, and the evidence did not demand the inference that the technical or trade meaning was known to the defendants. On the other hand, the evidence warranted the conclusion that, upon a question arising as to the interpretation of this phrase, its meaning was discussed with an agent who had apparent authority to speak for the company and who assented to the construction now relied on by the defendants. The defendants both testified to the facts alleged in the amended plea, and the trial judge was authorized to find every material averment proved by the evidence.

We have found nothing in the brief or argument of counsel for the plaintiff in error which could be taken as an insistence upon the special grounds of the demurrers; but whether these grounds have been waived, and whether any of them had been well taken, or not, the judgment will not be reversed because of the rulings thereon. They related in the main to the sufficiency of the allegations as to the authority of Cooper; and whether or not the pleadings were of sufficient particularity as to that matter, the issue as to his authority was thoroughly investigated upon the trial, and apparently all facts material thereto were fully developed by the evidence. Therefore the plaintiff was not finally harmed by error, if any, which the trial court may have committed in ruling upon the demurrers in regard to this question. *Fidelity & Deposit Co.* v. *Norwood,* 38 *Ga. App.* 534 (144 S. E. 387); *Benton* v. *Roberts,* 41 *Ga. App.* 189 (152 S. E. 141).

*Judgment affirmed. Jenkins, P. J., and Stephens, J., concur.*